UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Michael A. Rowe

v.                                    Civil No. 11-cv-366-JL

Liberty Mutual Group, Inc.

**MEMORANDUM ORDER**

Michael Rowe has sued his former employer, Liberty Mutual Group, Inc., claiming his termination violated New Hampshire's Whistleblowers' Protection Act, N.H. Rev. Stat. Ann. § 275-E:2, and amounted to wrongful termination under the common law.  This court has jurisdiction under 28 U.S.C. § 1332(a)(1) (diversity).  To resolve a long-running discovery dispute, Liberty Mutual has moved for a protective order, see Fed. R. Civ. P. 26(c)(1), against the disclosure of information allegedly shielded by the attorney-client privilege.  Rowe, for his part, has moved this court to reconsider a prior order denying one of his motions for unrelated discovery relief, see L.R. 7.2(e), and to amend his complaint, see Fed. R. Civ. P. 15(a)(2).  For the reasons explained below, Liberty Mutual's motion for a protective order is granted in part and denied in part, while Rowe's motion for reconsideration and motion to amend are denied.

I.   **Background**

Rowe commenced employment with Liberty Mutual in 2005, and, by 2010, held a director-level position for the company, working out of its office in Portsmouth, New Hampshire.  Among his responsibilities was consulting with the company's attorneys on a lawsuit alleging that a business practice of a company Liberty Mutual had acquired, Safeco Insurance Company of America, violated Montana law.  See Ferguson v. Safeco Ins. Co. of Am., No. 04-628B (Mont. Dist. Ct. Sept. 23, 2004).  The lawsuit, a class action, alleges that, in violation of Montana's "made-whole" doctrine, Safeco had asserted its subrogation rights under its policies although its insureds had not yet been fully reimbursed for all losses, including "costs of recovery."

Rowe alleges that, on April 4, 2011, an in-house attorney for Liberty Mutual, Nancy Brown, asked him to spare two employees who had been designated for termination under an upcoming reduction-in-force ("RIF") from that fate because their depositions had been scheduled in the Ferguson case.  Attorney Brown also allegedly asked Rowe to "communicate to [those employees] that their jobs were being saved because of their importance to [the] case."  Rowe alleges that he refused to do so.

Two days later, on April 6, 2011, a meeting took place among Attorney Brown, Tricia Rice Wood, another in-house attorney for Liberty Mutual, and Heather Buckley, a human resources employee involved in the decision to terminate Rowe.  The stated purpose of this meeting, according to Liberty Mutual, was to discuss whether the imminent RIF should, in fact, include the deponents in the Ferguson lawsuit.  Rowe had been invited to the meeting, but could not attend because, at that point, he was en route to Liberty Mutual's facility in Fenton, Missouri, where the RIF was scheduled to occur.  The RIF was announced the day after the meeting, i.e., April 7, 2011, and, as originally planned, included the employees scheduled to be deposed in Ferguson.

On April 15, 2011, Rowe was told that he was being terminated, he says, "because of his conduct in the Ferguson case and in the RIF."  Rowe alleges that he was fired because he had refused to spare the Ferguson deponents from the RIF, which he asserts would have been illegal and violated public policy.  Thus, Rowe claims, his termination was illegal under the Whistleblowers' Protection Act, N.H. Rev. Stat. Ann. § 275-E:2, I(b), and wrongful under New Hampshire common law, Cloutier v. Great Atl. & Pac. Tea Co., 121 N.H. 915, 920 (1981).  Rowe also claims that, in further violation of the Whistleblowers' Protection Act, he was fired because he had "rais[ed] concerns

that Liberty Mutual could face exposure for failing to comply with 'made-whole' statutes in jurisdictions other than Montana." In particular, Rowe alleges that, before his termination, he "requested a telephone conference with Liberty Mutual counsel in order to address his concerns regarding Liberty Mutual's potential failure to comply with 'made-whole' statutes in other jurisdictions," but that he was terminated prior to the date of the scheduled meeting.

The scheduling order in this action, as twice extended upon the parties' joint motion, imposed a simultaneous discovery cutoff and summary judgment deadline of April 1, 2013.  Through counsel, Rowe took extensive discovery from Liberty Mutual, by interrogatories, see Fed. R. Civ. P. 33, document requests, see Fed. R. Civ. 34, and the depositions of nine different Liberty Mutual employees, including Attorney Brown and Buckley.

At those depositions, counsel for Liberty Mutual instructed Attorney Brown and Buckley not to answer questions, on attorney-client privilege grounds, about the April 6 meeting.  That meeting, however, is discussed in some detail in an "Employee Relations Situational Analysis" that Liberty Mutual prepared in terminating Rowe--and produced to him in discovery in this action.  Specifically, the "Situational Analysis" states that, on April 6,

4

>        [Wood], Brown and Buckley meet to review the situation.
>        A decision is made to continue with the notification of
>        the entire [Fenton] organization [about the RIF] as
>        planned.  We agree that [the Human Resources Group]
>        will be involved in the meetings with the 2 employees
>        who are key witnesses to assure any questions/
>        communications are routed immediately to [Attorney
>        Brown] to assure [the] Business Law Group manages any
>        questions directly.

Liberty Mutual had also objected, on the grounds of both attorney-client and work product privilege, to Rowe's requests for documents concerning the April 6 meeting.  In fact, Liberty Mutual objected to a number of Rowe's document requests and interrogatories on the grounds of either the attorney-client or work product privileges, identifying some of those documents in a privilege log, produced in June 2012, and a supplemental privilege log, produced in November 2012.

Liberty Mutual also objected to some of these same discovery requests as "overbroad, unduly burdensome and unlikely to lead to the discovery of admissible evidence," including Rowe's request for "all communications relating in any way to concerns [he] expressed during his employment relating to Liberty Mutual's compliance with 'made-whole' laws in any jurisdiction whatsoever."  Again, beginning with his promotion to the director position in 2009, one of Rowe's responsibilities was to consult with Liberty Mutual's attorneys as to the Ferguson lawsuit. Thus, Liberty Mutual states, reviewing all of its communications

during that period for those "relating in any way to concerns
[Rowe] expressed . . . relating to [its] compliance with 'made-
whole' laws in any jurisdiction whatsoever" would "likely require
searching through thousands and thousands of pages of e-mails and
other documents"--hence, its undue burden objection.  Despite
this objection, Liberty Mutual identified what it characterizes
as some "documents that, while they were arguably beyond [Rowe's]
requests, did involve [his] communications about the Ferguson
case," listing them in the November 2012 privilege log.  Liberty
Mutual also produced some responsive documents (after securing
what it says was an agreement from Rowe's then-counsel that doing
so "would not waive the privilege"), including Rowe's
communications with Attorney Brown, on and around March 31, 2011,
"regarding his made-whole concerns in jurisdictions other than
Montana," and "a memorandum regarding made-whole in Montana."

     As the deadlines to complete discovery and file summary
judgment motions approached in this case, counsel for Rowe moved
to withdraw, stating that Rowe had "terminated the services" of
counsel's law firm.  This court granted the motion (Order of
April 9, 2013) and Rowe subsequently notified the court of his
intention to proceed pro se, rather than to seek replacement
counsel.  Rowe then filed a number of motions seeking various

forms of discovery relief.  In the meantime, Liberty Mutual filed a motion for summary judgment.  See Fed. R. Civ. P. 56.

In accordance with its informal procedure for resolving discovery disputes, see Order of Oct. 24, 2011, at 1-2, the court held a telephone conference in May 2012 to address Rowe's motions.  Following the conference, the court issued an order granting Rowe leave to take the deposition of an additional Liberty Mutual employee, but otherwise denying his discovery motions--"except insofar as they seek particular information as to which Liberty Mutual has claimed attorney-client or work product privilege." Order of May 20, 2013, at 1-2.  This information included the substance of the April 6 meeting among Attorney Brown, Attorney Wood, and Buckley, as well as "certain communications, in which Rowe participated, related to his alleged concerns over Liberty Mutual's made-whole practices, including the Ferguson litigation in Montana, as identified in privilege logs that Liberty Mutual provided in this action in June 2012 and November 2012." Id. at 2-3 (quotation marks omitted).

Noting Rowe's position that "to the extent any of these communications were privileged to begin with, Liberty Mutual has waived the privilege," the court ordered Liberty Mutual to file a motion for a protective order.  Id.  The court directed that this

7

motion show both that the communications were privileged and that any privilege had not been waived, specifically, by disclosing a substantial part of the communications at the April 6 meeting, or by putting other communications at issue through Liberty Mutual's defense in this case, including its position that Rowe never raised any concerns about Liberty Mutual's "made-whole" practices, aside from his communications to Attorney Brown around March 31, 2011 (which, again, Liberty Mutual has already produced). Id. at 3-4. Liberty Mutual has since filed a motion for protective order as to the communications, and Rowe has filed an objection. Rowe has also moved for reconsideration of the order, claiming that this court should have granted his motion to compel Liberty Mutual to provide updated answers to his interrogatories. He has additionally moved to amend his complaint.

## II.   **Analysis**

## A.   **Protective order**

"A party or any person from whom discovery is sought may move for a protective order," which "[t]he court may, for good cause issue . . . to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," including by "forbidding inquiry into certain matters, or limiting the

scope of disclosure or discovery to certain matters." Fed. R. Civ. P. 26(c)(1)(D).  At this court's direction, Liberty Mutual has moved for such an order, forbidding inquiry into two categories of communications it says are protected by the attorney-client privilege:  (1) those concerning the April 6 meeting among Attorney Brown, Attorney Wood, and Buckley, and (2) those related to Rowe's alleged concerns about Liberty Mutual's made-whole practices, as identified in the November 2012 privilege log (as it turns out, no such communications are identified on the June 2012 privilege log).

As Liberty Mutual acknowledges, state law governs the application of the attorney-client privilege in a diversity action like this one.  See Fed. R. Evid. 501; Fashion House, Inc. v. KMart Corp., 892 F.2d 1076, 1098 n.11 (1st Cir. 1989). Liberty Mutual further assumes, and Rowe does not disagree, that it is the New Hampshire law of attorney-client privilege that applies here.  Under New Hampshire law, "'[a] client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client.'" Livingston v. 18 Mile Point Drive, Ltd., 158 N.H. 619, 627 (2009) (quoting N.H. R. Evid. 502(b)).

But the privilege is waived if its holder "knowingly and
voluntarily discloses or consents to disclosure of any
significant part of the privileged matter." N.H. R. Evid. 510.
New Hampshire has also "recognized the concept of implied waiver"
of the attorney-client privilege, which "occurs when the
asserting party has put the otherwise privileged communications
'at issue' in the present dispute." In re Dean, 142 N.H. 889,
890 (1998).  The party invoking the privilege, here, Liberty
Mutual, bears the burden of showing both that the privilege
applies and that it has not been waived by disclosure of the
privileged material.  See Walker v. N.H. Admin. Office of Cts.,
No. 11-cv-421, 2013 WL 672584, at *8 (D.N.H. Feb. 22, 2013).

Applying these standards, the court finds that Liberty
Mutual has waived any attorney-client privilege as to both the
April 6 meeting and the communications about the Ferguson lawsuit
identified on its privilege logs, and therefore denies its motion
for a protective order insofar as it seeks to prevent those
materials from disclosure in their entirety.  See infra Parts
II.A.1.a-b.  As a result, the court orders Liberty Mutual to
produce the two witnesses whom it instructed not to testify as to
the April 6 meeting for re-opened depositions on that subject,
and to produce the documents concerning the meeting identified in
its privilege logs.  See infra Part II.A.2.a.  In light of the

10

possibility that the communications about Ferguson identified on
the privilege logs are not responsive to Rowe's discovery
requests, however, the court orders those materials produced for
in camera review, which will enable the court to determine
whether or not they are in fact relevant and should be produced
to Rowe.  See infra Part II.A.2.b.

    **1.   Waiver**

        **a.   April 6 meeting**

The court finds that Liberty Mutual has waived any privilege
as to the April 6 meeting by producing, in discovery here, the
Situational Analysis, which describes the substance of that
meeting in detail.  By producing that document, then, Liberty
Mutual "knowingly and voluntarily disclose[d] . . . [a]
significant part of the privileged matter."  N.H. R. Evid. 510.
Indeed, Liberty Mutual makes no effort to show otherwise, instead
stating that, while it "maintains the privilege has not been
waived," it "recognizes, however, that the Court may reach an
opposite conclusion."  So the court does just that.

        **b.   Communications about <u>Ferguson</u>**

Liberty Mutual has listed on its November 2012 privilege log
certain communications it characterizes as "arguably beyond" the
scope of Rowe's discovery requests, including his request for
communications "relating in any way to concerns [he] expressed

. . . relating to [its] compliance with 'made-whole' laws in any jurisdiction whatsoever."  Liberty Mutual states that the logged communications "involve [Rowe's] communications about the Ferguson case," which itself "involves only Montana law." Because such "communications, by definition, related only to the application of made-whole law in Montana," Liberty Mutual argues, it has not put the logged communications at issue in this case by taking the position that "the first (and only) time [Rowe] raised concerns about any other jurisdiction was on March 31" (as reflected in communications that, as discussed above, Liberty Mutual has in fact produced).

The problem with this argument is its assumption that, merely because a communication by Rowe can be characterized as "about the Ferguson case," it is "by definition related only to the application of made-whole law in Montana."  The fact that the Ferguson lawsuit is premised on alleged violations of Montana made-whole law does not of its own force refute the existence of communications "about the Ferguson case" that express concerns about violations of made-whole laws in other jurisdictions. Evidence of such violations by Liberty Mutual, or its predecessors-in-interest, could arguably be relevant evidence in the Ferguson case itself and, even short of that, it is hardly

inconceivable that communications "about" that case would include discussions of Liberty Mutual's made-whole practices elsewhere.

So far as the court can tell, moreover, Liberty Mutual has never flatly denied the existence of communications "about the Ferguson case" that also reflect Rowe's stated concerns about the company's compliance with made-whole laws outside of Montana. To the contrary, Liberty Mutual says that the entries on its privilege log reflect communications that are "arguably"--not unquestionably--beyond that category. And Liberty Mutual's position that Rowe never raised such concerns until March 31, 2011 (as articulated in its summary judgment motion) is based solely on Rowe's inability to identify, at his deposition in this case, particular states where he thought the company's made-whole practices were deficient--as opposed to, for example, positive statements by other Liberty Mutual employees that Rowe had never raised that subject with them before March 31, 2011.[1]

---

[1]This is in contrast to the other assertion that Liberty Mutual says did not affect a waiver of attorney-client privilege: that Attorney Brown, the in-house attorney who allegedly asked Rowe to spare the Ferguson deponents, had no involvement with Rowe's subsequent termination. Attorney Brown testified at her deposition that she was not consulted about Rowe's termination, and Rowe admitted at his deposition that he had no reason to disagree with that. Given this evidentiary support for Liberty Mutual's assertion that there were no privileged communications between Attorney Brown and anyone else concerning Rowe's termination (at least before it occurred), the court need not consider whether, if such communications in fact existed, Liberty

So, in saying that Rowe did not raise any concerns over Liberty Mutual's compliance with made-whole laws outside of Montana until March 31, 2011, Liberty Mutual is also saying that Rowe did not raise any such concerns in the course of his work on the Ferguson litigation.  This, in turn, amounts to an assertion that Rowe did not raise any such concerns during his privileged communications with Liberty Mutual's attorneys about the Ferguson case.  Liberty Mutual's position, then, "has put the otherwise privileged communications at issue in the present dispute," effecting an implied waiver.  Dean, 142 N.H. at 890.

As the Court of Appeals has explained, "[s]uch waivers are inevitably premised on fairness concerns," namely, that "the party asserting the privilege placed protected information in issue for personal benefit through some affirmative act, and [a] court [finds] that to allow the privilege to protect against disclosure of that information would [be] unfair to the opposing party."  In re Keeper of Records (Grand Jury Subpoena to XYZ Corp.), 348 F.3d 16, 24 (1st Cir. 2003) (quotation marks omitted).  Because, again, Liberty Mutual seeks to benefit its defense in this action by arguing that Rowe did not raise any

---

Mutual has impliedly waived the privilege.  Liberty Mutual's motion for protective order is denied as moot insofar as it would prevent the disclosure of such communications.

concerns about its made-whole practices outside of Montana until March 31, 2011 (including, necessarily, in privileged communications with its attorneys), allowing Liberty Mutual to shield any such communications would be unfair to Rowe.

Indeed, Liberty Mutual's assertion presents one of the "principal . . . circumstances in which such unfairness is recognized," i.e.,

> [w]here a privilege holder has made assertions about privileged communications, but has attempted to bar other evidence of those communications [so] there is a serious danger that his assertions are false or misleading. Thus, where [the] assertions have been offered as a material issue in a judicial proceeding, the privilege should be revoked at least with respect to any communications whose disclosures might affect the factfinder's judgment as to that issue.

Koster v. Chase Manhattan Bank, No. 81-5018, 1984 WL 883, at *4 (S.D.N.Y. Sept. 18, 1984) (quoting United States v. Aranoff, 466 F. Supp. 885, 862 (S.D.N.Y. 1979)).

Again, Liberty Mutual has asserted, in effect, that privileged communications with its attorneys as to the Ferguson litigation do not reflect Rowe's concerns over the company's compliance with made-whole laws outside of Montana, but has refused to produce any of those communications--even insofar as they are "arguably" responsive to Rowe's discovery requests. Those communications, of course, could affect the factfinder's judgment in this action as to the accuracy of Liberty Mutual's

15

assertion (which, absent their disclosure, will simply remain untested).[2]  The court finds that Liberty Mutual's assertion that Rowe never voiced concerns over its made-whole practices beyond Montana until March 31, 2011, effects an implied waiver of the attorney-client privilege as to the communications as to the <u>Ferguson</u> lawsuit identified in Liberty Mutual's November 2012 privilege log.[3]

### 2. Remedy

"If a motion for a protective order is wholly or partly denied, the court may, on just terms, order that any party or person provide or permit discovery." Fed. R. Civ. P. 26(c)(2). This rule gives the court discretion in, among other things, "controlling details of time, place, scope and financing for the protection of deponents and parties." St. Hillaire & Assocs., Inc. v. FDIC, No. 92-511, 1994 WL 575773, at *1 (D.N.H. Oct. 13, 1994) (quotation marks omitted).

---

[2]It is worth noting that, absent an implied waiver, Rowe himself would not be able to testify to these communications. Because Liberty Mutual, and not Rowe, was the client for purposes of his discussions with its attorneys about the <u>Ferguson</u> case, Rowe cannot unilaterally waive the applicable privilege. <u>See</u>, <u>e.g.</u>, In re Richard Roe, Inc., 168 F.3d 69, 72 (2d Cir. 1999).

[3]This finding does not apply to the communications on other subjects included on the logs.  It applies only to those entries as to which the <u>Ferguson</u> case or related topics (e.g., "MT subrogation") is identified as the subject-matter.

### a.  April 6 meeting

Liberty Mutual urges the court to use its discretion under Rule 26(c)(2) to prevent Rowe from taking any further discovery as to the April 6 meeting or, in the alternative, to limit that discovery to interrogatories, rather than further depositions. The court declines to do so.

As discussed above, Liberty Mutual's counsel instructed two different witnesses, Attorney Brown and Buckley, not to answer deposition questions from Rowe's counsel about the April 6 meeting on the basis of attorney-client privilege.  Counsel for Liberty Mutual gave these instructions despite the fact that the substance of the meeting was disclosed in detail in the "Situational Analysis" that Liberty Mutual produced to Rowe in discovery--which was so clearly a waiver of the privilege that Liberty Mutual cannot even muster an argument to the contrary at this point.  See Part II.A.1, supra.  So Liberty Mutual cannot be heard to complain now that "it would be more efficient and less disruptive if [Rowe] were permitted to proceed by interrogatories as to [those witnesses] rather than re-convening two depositions."  Any inefficiency or disruption in re-opening those depositions is the result of Liberty Mutual's still unexplained decision to instruct the witnesses not to answer the first time they were deposed.

Liberty Mutual also invokes the rule that "[t]aking depositions of opposing trial counsel is generally disfavored and discouraged." In re Tyco Int'l Ltd., No. 02-1335, 2007 WL 2682763, at *1 (D.N.H. Sept. 7, 2007).  That rule is irrelevant here.  Neither of the deponents are "trial counsel" in this action (Buckley is not an attorney at all) and, while some courts have treated "supervising in-house counsel" for the litigation as "trial counsel" for purposes of this rule, see, e.g., Shelton v. Am. Motors Corp., 805 F.2d 1323, 1325-27 (8th Cir. 1986), Attorney Brown, so far as the court is aware, has no involvement in managing this litigation for Liberty Mutual.[4]

So the court rejects Liberty Mutual's argument that Rowe should not be able to re-open the depositions of Attorney Brown and Buckley.  The court agrees with Liberty Mutual, however, that the questioning at the re-opened depositions should be limited to

---

[4]Liberty Mutual argues that the rule should also prevent Rowe from taking the deposition of Attorney Wood, "the primary attorney at Liberty Mutual charged with overseeing this litigation."  So far as the court can tell, however, Rowe has never sought Attorney Wood's deposition and, if he did so at this point, would run into at least two additional problems:  (1) the discovery cutoff expired more than three months ago, and (2) as Liberty Mutual points out, Rowe has already hit the limit of 10 depositions imposed by the parties' agreed-upon discovery plan (he took 9 while he was represented by counsel, and one more since then).  So, at the moment, this court expresses no view on whether, or the extent to which, Attorney Wood's deposition would be appropriate, because Rowe has not asked for the relief necessary to take her deposition.

the April 6 meeting itself.  As Liberty Mutual points out, the waiver effected by the Situational Analysis is limited, in relevant part, to the substance of that meeting, and there is no apparent basis for inferring a waiver that is broader in scope. See Keeper of Records, 348 F.3d at 23-24.

Liberty Mutual also argues that, given Rowe's pro se status, it "is justifiably concerned that the depositions would quickly expand beyond the contents of the April 6, 2011 meeting."  The court agrees that this is a legitimate concern, but disagrees that it warrants a bar on re-opening the depositions of Attorney Brown and Buckely.  Instead, as set forth below, the court orders Liberty Mutual to produce those witnesses for further deposition at the courthouse, so that, if necessary, the court can readily ensure that Rowe limits his questions to the April 6 meeting. The court will also order Liberty Mutual to produce to Rowe forthwith the documents related to the April 6 meeting that it has identified on its privilege logs, as Liberty Mutual announces "it is prepared to do" if the court finds, as it has, that the company has waived any privilege as to the meeting.

### b.   Communications about **Ferguson**

The communications about the Ferguson lawsuit identified on the privilege logs, however, require a different approach. Again, Liberty Mutual has asserted that, at least "arguably,"

those materials are not responsive to Rowe's discovery requests
here, insofar as they do not reflect concerns he expressed as to
Liberty Mutual's made-whole practices outside of Montana.  When a
party seeks a protective order as to certain documents, "[c]ourts
should not simply take representations of interested counsel on
faith, but should instead conduct a limited in camera review" of
the documents to determine whether the party should produce them.
Healey v. I-Flow, LLC, 282 F.R.D. 211, 214 (D. Minn. 2012).
Indeed, "requiring parties who seek to avoid disclosure of
documents to make the documents available for in camera
inspection . . . is well established in the federal courts." In
re Grand Jury Subpoena (Mr. S), 662 F.3d 65, 70 (1st Cir. 2011)
(quotation marks omitted).

     In line with that practice, this court will order Liberty
Mutual to submit, for in camera inspection, the communications
about the Ferguson lawsuit or related topics identified on its
privilege log of November 2012.  The court will promptly review
those documents to determine their relevance, if any, to this
action, and will issue a brief order setting forth its rulings on
that subject (without disclosing the substance of any of the
documents).  If the court rules that any of the documents are, in
fact, relevant, Liberty Mutual will be ordered to produce those
documents to Rowe.  Liberty Mutual will be granted a protective

                              20

order against producing any documents submitted for in camera
review which the court deems irrelevant to this action.

## B.    Reconsideration

Rowe, for his part, has moved for reconsideration of this
court's prior order on the parties' discovery motions to the
extent that it denied his motion to compel Liberty Mutual to
update its interrogatory responses.  Specifically, Rowe asks for
reconsideration of the order insofar as it allows Liberty Mutual
"to maintain its original boiler plate objections."  The motion
for reconsideration, however, fails to identify any particular
interrogatory as to which Rowe says that Liberty Mutual
interposed such an objection.  Nor, for that matter, did Rowe's
original motion to compel, which asked the court to order Liberty
Mutual "to fully update its answers to interrogatories to the
extent that they conflict in any material way with the record,"
including by "reconcil[ing] the conflicting testimony of its
witnesses and conflicting evidence into a single updated
responses."[5]

While the motion also asked that Liberty Mutual be ordered
to "remov[e] boilerplate objections that have become

_____

[5]As the court explained to Rowe during the telephone
conference on this motion, the Federal Rules of Civil Procedure
do not impose such an obligation.

21

indefensible," Rowe, again, did not identify any particular interrogatory that Liberty Mutual had met with such an objection, and he does not do so now.  In short, Rowe has failed to "demonstrate that the [prior] order was based on a manifest error of fact or law," L.R. 7.2(e), insofar as it denied his motion to compel Liberty Mutual to update its interrogatory responses.  His motion for reconsideration is denied.

## C.   Amendment

Rowe has also moved for leave to file an amended complaint to set forth an additional theory of wrongful termination under New Hampshire law.  Rowe's new theory is that he was fired at least in part because, after the criteria for including employees in the RIF had been set, he transferred two employees to new positions so they would not be subject to those criteria.  One of those employees was a minority.  Thus, Rowe claims, he was fired because he "ensured that the selected employees' [*sic*] rights under Title VII [of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2] were protected."

In support of his motion for leave to amend, Rowe invokes Rule 15(a)(2) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall freely give leave when justice

requires."[6]  But Rowe did not file his motion to amend until May
31, 2013, two months after Liberty Mutual filed its motion for
summary judgment and, moreover, nearly 16 months after his
deadline to amend his pleadings, which, as set forth in the
parties' joint discovery plan, was February 1, 2012.  "Once
[such] a scheduling order is in place, the liberal default rule
[of Fed. R. Civ. P. 15(a)(2)] is replaced by the more demanding
'good cause' standard of Fed. R. Civ. P. 16(b)."  Steir v. Girl
Scouts of the USA, 383 F.3d 7, 12 (1st Cir. 2004).  Under that
rule, "[a] schedule may be modified only for good cause," Fed. R.
Civ. P. 16(b)(4), a standard which "focuses on the diligence (or
the lack thereof) of the moving party."  Steir, 383 F.3d at 12.

Rowe fails to show that he acted with diligence in moving to
amend his complaint such that there is good cause to allow him to
do so at this late date.  Rowe says that he did not include the
proposed new theory "in his original complaint because he did not
know that his actions" in transferring the minority employee so

---

[6]Liberty Mutual has moved to file a late objection to the
motion to amend, explaining that "miscommunication" resulted in
its filing the objection on Monday, June 17, 2013, instead of
Friday, June 14, 2013, the day it was due.  While Rowe declined
to assent to Liberty Mutual's motion to file a late objection, he
has yet to file any objection to that relief.  So Liberty
Mutual's motion to file the late objection is granted, and the
objection was considered in ruling on the motion.

he would not be subject to the RIF "were a primary reason for his termination" under Liberty Mutual's official version of events.

But, even assuming that Rowe did not know this when he filed his original complaint, he learned it, at the latest, when Liberty Mutual produced the Situational Analysis in discovery. After discussing Rowe's decision to transfer the minority employee despite an alleged "directive" against personnel moves in the division to be subject to the RIF, the Situational Analysis concludes that "[d]uring the numerous discussions around the [RIF], . . . Rowe has on several occasions appeared unconcerned at the direction given to him by [Human Resources] and Legal," including times when "he failed to follow specific direction."  Rowe came into possession of this document during spring 2012, at the latest.  Rowe has not shown good cause, or any cause, for waiting a year or so beyond that to move to amend his complaint.[7]  His motion to amend is denied.

---

[7]Rowe argues at length that Liberty Mutual only recently, as a result of the court's prior discovery order, provided discovery as to the alleged February 2011 "directive" not to make any staffing changes in the division subject to the then-upcoming RIF.  Even assuming Rowe's charge of delayed discovery is accurate, however, it had no effect on his knowledge, upon first seeing the Situational Analysis, that he was fired for, among other things, transferring the minority employee in spite of the alleged "directive."  Relatedly, the court's denial of Rowe's motion to amend his complaint is not intended to prevent him from trying to show that Liberty Mutual's claim that he violated the "directive" is mere pretext for the real reasons that his

**D.    Scheduling**

In this court's prior order, it announced that, following its ruling on Liberty Mutual's motion for protective order, the court would set deadlines for the completion of briefing on Liberty Mutual's motion for summary judgment. Order of May 20, 2013, at 4. The court cannot yet do so, however, because, as a result of the ruling on the protective order, further discovery will occur, including re-opening depositions, conducting in camera review, and, depending on the results of that review, potentially providing Rowe with additional documents. See Part II.A.2, supra. Following the completion of those events, the court will hold a telephone conference with the parties to arrange a schedule for the rest of the summary judgment briefing, and to select the earliest new trial date possible.

For reasons wholly unrelated to the events of this case, the trial must be continued from the September 2013 trial period. During that period, the court is already scheduled to try a civil case that has been pending nearly a year longer than this one, as well as criminal cases, and those trials, in combination, are expected to consume nearly the entire month. The court assures

---

existing complaint says he was fired, or that the alleged "directive" was never in fact given.

Rowe, however, that any trial in this matter will occur as soon as reasonably possible.

## III. __Conclusion__

For the foregoing reasons, Liberty Mutual's motion for a protective order[8] is GRANTED in part and DENIED in part as described above; Rowe's motion for reconsideration[8] and motion to amend[9] are DENIED; and Liberty Mutual's motion to file a late objection to the motion to amend[10] is GRANTED.

As set forth more fully above, Liberty Mutual shall produce Attorney Nancy Brown and Heather Buckley for re-opened depositions, limited to the subject of the April 6, 2011, meeting.  These depositions shall occur at the courthouse, before an official court reporter paid by Liberty Mutual, at the earliest possible time that is mutually convenient to those witnesses, Liberty Mutual's lead counsel of record, Rowe, and the court.  Within 3 days of the date of this order, counsel for Liberty Mutual shall contact Rowe to provide dates as to the availability of the witnesses and, after confirming one or more

---

[8]Document no. 60.

[8]Document no. 59.

[9]Document no. 58.

[10]Document no. 64.

of those dates with Rowe, shall forthwith provide the date(s) to this court's deputy clerk assigned to this action.

Liberty Mutual shall also, within 3 business days of the date of this order, (a) produce to Rowe the documents related to the April 6 meeting that it has identified on its privilege logs, and (b) submit to this court, for in camera review, all communications about the Ferguson lawsuit or related topics identified on its privilege log of November 2012.  The court will promptly review those materials to determine their relevance, if any, to this action and issue a further order as appropriate.

Finally, this case is removed from the court's trial calendar for the September 2013 trial period, and the final pretrial conference and all associated deadlines are stayed accordingly.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  July 16, 2013

cc:  Michael A. Rowe, pro se
     Emily G. Rice, Esq.
     Edward J. Sackman, Esq.

27