UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

<u>Michael A. Rowe</u>

     v.                              Civil No. 11-cv-366-JL
                                           Opinion No. 2013 DNH 168

<u>Liberty Mutual Group, Inc.</u>

### <u>MEMORANDUM ORDER</u>

The central question in this case is whether the defendant, Liberty Mutual Group, Inc., fired the plaintiff, Michael A. Rowe, from his job as a director in its subrogation division because he refused to do something that he believed was against the law or, at least, was contrary to public policy.  On April 7, 2011, Rowe was scheduled to meet with the managers at the company's office in Fenton, Missouri, to discuss a reduction-in-force ("RIF"), being announced that very day, which would result in the layoff of 37 employees.  The meeting was scheduled for 9 a.m., but Rowe did not arrive until almost 10 a.m.  The next morning, a senior vice president in Rowe's division initiated the process that led to his dismissal one week later for his "performance failure" on the RIF, including his late arrival to the meeting.

Rowe, through counsel, subsequently filed this action against Liberty Mutual.  He claims that, in reality, the company fired him for performing acts that public policy would encourage and refusing to perform acts that public policy would condemn, in

violation of New Hampshire common law, see Cloutier v. Great Atl. & Pac. Tea Co., 121 N.H. 915, 920 (1981), as well as for "object[ing] to or refusing to participate in any activity that [he], in good faith, believes is a violation of the law," in violation of the state's Whistleblowers' Protection Act, N.H. Rev. Stat. Ann. § 275-E:2.

Specifically, Rowe alleges that he was terminated "for refusing to pull . . . from the RIF" two employees whose depositions had been sought in a class-action lawsuit pending in a Montana court against Liberty Mutual's predecessor-in-interest, Ferguson v. Safeco Ins. Co. of Am., No. 04-628B (Mont. Dist. Ct. Sept. 23, 2004), and "refusing to tell them that [Liberty Mutual] was sparing them from the RIF because of [that] case." Rowe's complaint asserts that public policy would condemn these acts because "public policy discourages inducing someone to give false testimony" (which, Rowe claims, Liberty Mutual would have been doing by telling the employees it "was sparing them from the RIF because of the Ferguson case" in which they were scheduled to be deposed). Also playing a role in his firing, Rowe claims, was another act on his part that public policy would encourage: "raising concerns that Liberty Mutual could face exposure for failing to comply with 'made whole' statutes in jurisdictions other than Montana," where the alleged violation of that state's

"made-whole" law by the company's predecessor-in-interest was the gravamen of the <u>Ferguson</u> lawsuit.[1]

The court has jurisdiction over this action between Rowe, a New Hampshire citizen, and Liberty Mutual, an out-of-state corporation, under 28 U.S.C. § 1332(a)(1) (diversity).  Liberty Mutual has moved for summary judgment.  See Fed. R. Civ. P. 56. It argues, among other things, that Rowe has no evidence of any causal connection between his termination and his allegedly protected conduct, i.e., his refusal to tell the employees whose depositions had been sought in the <u>Ferguson</u> case that, as a result, they were not being laid off, and his "raising concerns" about Liberty Mutual's made-whole practices outside of Montana. In particular, Liberty Mutual argues that there is no evidence that any of its personnel who were involved in the decision to terminate Rowe knew that he had allegedly refused (or even been asked) to tell the two employees that they were being spared from the RIF because of the <u>Ferguson</u> case, or raised concerns about the company's made-whole practices beyond Montana.

Though Rowe--who, around the time discovery closed in this case, chose to fire his counsel of record and proceed pro se--has

_____

[1]Under the "made-whole" doctrine, in general, "it is only after the insured has been fully compensated for all of the [covered] loss that the insurer . . . is entitled to enforce its subrogation rights." 16 Steven Plitt et al., Couch on Insurance § 223:134 (3d ed. 2008).

filed a 63-page objection to Liberty Mutual's motion, he does not identify any record evidence from which a rational jury could conclude that the Liberty Mutual employees who played in a role in his termination knew of his allegedly protected activity. Instead, Rowe attempts to fill that gap by speculating as to the exchange of that information among Liberty Mutual employees. Speculation, however, cannot create a genuine issue of material fact sufficient to avoid summary judgment. See, e.g., Rivera-Colón v. Mills, 635 F.3d 9, 12 (1st Cir. 2011).

Rowe also accuses Liberty Mutual of the "obstruction of discovery" into what its employees told each other about his allegedly protected conduct.  But that accusation ignores the fact that, although Liberty Mutual had objected to discovery into certain of those communications, this court overruled the objections and ordered Liberty Mutual to provide that discovery, including by producing (at its sole expense) two of its witnesses for re-opened depositions.  Rowe, however, voluntarily chose not to proceed with the re-opened depositions, so he cannot complain now that the record remains undeveloped on this crucial issue. As explained more fully below, then, the court grants Liberty Mutual's motion for summary judgment.

I.   **Background**

This court's rules require that "[a] memorandum in opposition to a summary judgment motion shall incorporate a short and concise statement of material facts, supported by appropriate record citations, as to which the adverse party contends a genuine dispute exists." L.R. 7.2(b)(2).  As Liberty Mutual points out in its reply memorandum, Rowe's opposition memorandum does not comply with this rule.  Instead, its 55-page "Statement of Material Facts" consists almost entirely of argument, much of it unaccompanied by any record citations (though it does incorporate numerous lengthy excerpts from deposition transcripts and documents produced in discovery).[2]  That approach does not comply with Local Rule 7.2(b)(2).  See, e.g., Evans v. Taco Bell Corp., 2005 DNH 132, 2-3 (DiClerico, J.) (citing cases).  Rowe's announcement in his objection that he "expressly denies all of the allegations made against him in [Liberty Mutual's] motion for

_____

[2]Rowe does not, however, provide actual copies of the deposition excerpts or documents (many of which are not in the record).  This approach violates the Federal Rules of Civil Procedure, Fed. R. Civ. P. 56(c)(1)(a), this court's Local Rules, see L.R. 7.2(b)(2), and this court's preliminary pretrial order, Order of Oct. 24, 2011, at 1.  Nevertheless, the court has overlooked those transgressions and simply assumed that Rowe's memorandum accurately reproduces the portions of the documents on which it relies.  Rowe's opposition memorandum also violates L.R. 7.1(a)(3), which limits the length of a memorandum submitted in opposition to a dispositive motion to 25 pages, except by prior leave of court (which Rowe did not seek).  The court has nevertheless reviewed Rowe's 63-page opposition in its entirety.

summary judgment" also does not suffice to state the material facts as to which Rowe contends a genuine issue exists.  See, e.g., Traudt v. Roberts, 2013 DNH 094, at 4-5, appeal docketed, No. 13-1968 (1st Cir. Aug. 6, 2013).

As a result of Rowe's failure to "properly oppose[]" Liberty Mutual's motion for summary judgment, "[a]ll properly supported facts set forth in [its] factual statement shall be deemed admitted." L.R. 7.2(b)(2).  This court has nevertheless endeavored, in light of Rowe's pro se status, to make a reasonable effort to identify the facts he purports to dispute, and the record evidence supporting those positions, from among the 55 pages of Rowe's "Statement of Material Facts."  The following statement of facts reflects this approach.

**A.   Factual background**

**1.   The Ferguson litigation**

Rowe started working with Liberty Mutual in 2005, and, by 2010, held a director-level position in its subrogation division.[3]  In that job, Rowe worked out of Liberty Mutual's office in Portsmouth, New Hampshire, and earned, by his account, more than $207,000 in annual salary.

---

[3]Liberty Mutual's records reflect that Rowe was demoted twice during his tenure:  once at the end of 2007, and again at the end of 2008, when he assumed the director-level position.

Among Rowe's responsibilities was consulting with the company's attorneys on Ferguson, supra, a class-action lawsuit alleging that the business practices of a company Liberty Mutual had acquired, Safeco Insurance Company of America, violated Montana law.  Specifically, the plaintiffs in Ferguson (which, so far as the record here reveals, is still pending) claim that, in violation of Montana's "made-whole" doctrine, see note 1, supra, Safeco had asserted its subrogation rights under its policies although its insureds had not yet been fully reimbursed for all losses, including "costs of recovery."

On March 31, 2011, Rowe sent an email to Nancy Brown, an in-house attorney for Liberty Mutual responsible for handling the Ferguson lawsuit.  The body of the email stated, in its entirety,

> At some point I'd like to speak with you about our posture toward made whole states nationally.
>
> At one time we thought what we were doing in Montana was sufficient and though we've become much more stringent there, the old practices we followed in Montana are pretty much what we follow today in other made whole states.  Who's to say that this couldn't spread?
>
> If you have some preliminary thoughts you'd like to share as to how we might best consider our go forward strategy I'd appreciate them.

Brown responded, "I'll set up a call for next week," and proceeded to offer April 13, 2011.  Rowe did not respond until

April 14, 2011, when he offered to speak with Brown on April 18, 2011, instead.  Brown accepted that offer.

### 2.   The Fenton RIF

Rowe's responsibilities also included managing the RIF at Liberty Mutual's offices in Fenton.  As noted at the outset, he was scheduled to announce the RIF there on April 7, 2011, a Thursday.  On Monday, April 4, 2011, Rowe met with other Liberty Mutual employees working on the RIF to review the "communication plan including the proposed timeline and talking points.  After this session, Rowe was provided with a copy of the "communication plan" which indicated, among other things, that he was responsible for conducting a meeting with the "front-line managers" at the Fenton facility at 9 a.m. on the day of the RIF "to review talking points [and] next steps."

### a.   Brown calls Rowe

Also on Monday, April 4, Rowe received a telephone call from Brown.  Brown informed Rowe that two employees in the subrogation division, Don Miller and Ned Steck, had been noticed for deposition in the <u>Ferguson</u> case.  In response, Rowe told Brown that these employees were scheduled to be laid off as part of the RIF later that week.

According to Rowe's account of the balance of the call, set
forth in his answer to an interrogatory propounded by Liberty
Mutual, see Fed. R. Civ. P. 33,

> Attorney Brown stated that they would have to be pulled
> from the RIF.  I advised [her] that I did not have the
> authority to exclude employees from the RIF who met the
> criteria for the RIF and such authority would have to
> come from [human resources] and her counterparts in
> Liberty [Mutual's] Legal [Department] who approved the
> RIF criteria.  Attorney Brown persisted in trying to
> persuade me to exclude Mr. Steck and Mr. Miller from
> the RIF, stating that Mr. Steck had testified very
> poorly in another case she was involved in and that we
> couldn't afford poor testimony in [the Ferguson] case.
> [She] asked me if I thought that, if I spoke with
> [Steck and Miller] about sparing them from the RIF, we
> might get better testimony from them.  She added that
> the company could subject them to another RIF later.  I
> again stated I lacked the authority to do what she
> asked, nor would I be comfortable connecting their
> sworn deposition testimony with sparing their jobs
> because doing so would give the distinct impression
> that we were trying to influence testimony.  Attorney
> Brown was very unhappy and said she would call [Liberty
> Mutual's human resources department].

At his deposition, Rowe elaborated that he told Brown that "'if
[she] and whoever in human resources want[ed] to exclude [Steck
and Miller] from the RIF,'" then he (Rowe) was "'not going to
complain or object to it.  But . . . I don't have the authority
to make that decision, and I'm not going to do anything that
could appear to be illegal.'"

Rowe further testified that, at the end of his conversation
with Brown, she said she would "get back to" him, and he "made it
clear that [he] wasn't going to do anything . . . without

authority" (though he denied that Brown told him that he should refrain from taking action).  The "Employee Relations Situation Analysis" ("Situation Analysis") prepared prior to Rowe's termination, see infra Part I.A.2.e, paints a slightly different picture of his conversation with Brown.  According to the Situation Analysis, Brown "directed Rowe not to communicate to two employees as they have been named as key witnesses in a class action lawsuit.  Rowe advised he would update Brown shortly."[4]

### b.   Brown confers with others

Two days after Brown's conversation with Rowe, she exchanged several e-mails with Tricia Rice, an in-house employment attorney at Liberty Mutual.  Brown wrote that "[i]n a perfect world, we'd like the [two employees] not to be told about the RIF and to stay on . . . until their depos[itions] are taken" in June 2011.  Rice responded, "[n]ot telling them about the RIF does set up legal issues because we won't have a basis for terminating their employment in late June."

In the meantime, Rice spoke with Heather Buckley, an employee from Liberty Mutual's human resources department who, like Rowe, had been working on the RIF.  Rice then provided her

---

[4]While Brown's deposition was taken in this case, neither party has submitted any portion of her deposition testimony (or an affidavit sworn by her) that describes her April 4 conversation with Rowe.

thoughts to Brown in another email (copying Buckley) that laid
out--and rejected--several potential courses of action.  These
included delaying the entire RIF (rejected as not "possible
financially"), "delaying notice to just these two employees"
(rejected as making it "painfully obvious that they should have
been notified and they weren't" so that "the business case for
the RIF seem[s] pretextual"), and "telling them of the RIF now
but keeping them on until after the depositions" (rejected
because "[i]t may have the effect of looking like we 'paid them'
by continued employment to testify in a particular way").  But
none of the emails between Rice and Brown mentions that Rowe had
"refused" this last option, or, for that matter, any particular
course of action.  Indeed, the emails did not even mention Rowe's
reaction to the news that the deponents were scheduled to lose
their jobs in the RIF.

Rice also attempted to set up a meeting among herself,
Brown, Buckley, and Rowe, but Rowe declined the invitation,
writing, "I'm in route to Fenton and unable to attend."  Rowe
then sent an email to his boss, David Talianich, and one of the
managers at the Fenton facility, Drew Elston. Rowe's email stated
in its entirety:

> Heads up!  Nancy Brown is Liberty [Mutual] Corporate
> Counsel who seems to have taken the lead on Ferguson.
> On Monday she mentioned that plaintiff [*sic*] counsel
> wants to take depositions from Don Miller and Ned

> Steck.  I had no idea that Ned ever had any involvement
> in this.  In any event I shared confidentially with
> Nancy that both were in the process of being RIFF"d
> [*sic*] and now it looks like they are trying to
> intercede in the RIF.  This would be particularly
> difficult with regard to Ned where he is a remote
> employee.
>
> Unfortunately I'm on a bus to the airport that does not
> allow cell phone use.

This email does not elaborate upon what Rowe means by "trying to intercede in the RIF," nor does it mention Brown's alleged request to remove Steck and Miller from the RIF in conjunction with telling them their jobs were being spared so they could testify in <u>Ferguson</u>.  Rowe acknowledged at his deposition, in fact, that this e-mail does not "say anything . . . about Ms. Brown having asked [him] to do something that [he] believed was improper."  Rowe also acknowledged that, aside from this email and "probably" a conversation with Elston, he did not tell anyone else that the depositions of Steck and Miller had been sought, let alone that Brown had allegedly asked to remove them from the RIF in a quid pro quo for their favorable testimony.

Later in the day on April 6, Rice met with Brown and Buckley.  At the meeting, according to the "Situation Analysis," the "decision [was] made to continue with the notification of the entire subrogation organization [of the RIF] as planned," and for the human resources department to "be involved in the meetings with the [two] employees who are key witnesses to assure any

questions/communications are rooted [*sic*] immediately to [Brown] to assure [she] manages any questions directly."

At her deposition, Buckley was asked--and answered--several questions about the meeting.[5]  She recalled that Brown said "she had an outstanding issue with Rowe," namely, that "two employees were named as witnesses in a lawsuit and that there was a request not to notify these employees, and we were waiting from an update from Mr. Rowe on the status."  Buckley further recalled that Brown said "she had told [] Rowe not to communicate to Steck and Miller . . . that they were going to be RIFed."  But Buckley did not testify (at least not in any portion of her deposition transcript submitted to the court) to Brown's saying that she had asked Rowe, as he now claims, to speak with Steck and Miller about sparing them from the RIF in the hope of influencing their testimony, or that Rowe had expressed any concerns to Brown about Liberty Mutual's compliance with made-whole laws.

---

[5]Counsel for Liberty Mutual instructed Buckley not to answer certain other questions about the meeting on the basis of attorney-client privilege.  As noted at the outset, and discussed in more detail infra at Part I.B.1, this court eventually ruled that any privilege had been waived, and, as a result, ordered Liberty Mutual to produce Buckley (and Brown) for further deposition on the subject of the meeting.  Rowe, though, declined to proceed with the re-opened depositions.

### c.   **Buckley contacts Rowe**

After the meeting, Buckley emailed Rowe, telling him that she and Rice "were able to address [Brown's] concerns" and that she (Buckley) had "updated" April Uskoski, another human resources employee working on the RIF.  Buckley wrote that she also wanted to "update" Rowe but that, in the meantime, "the critical components" were that he should "[c]ontinue with the communication as planned" to Steck and Miller and have Uskoski put them in touch with the legal department if they had "questions with respect to the [Ferguson] case."  Rowe did not respond to this email.

Rowe did, however, call Buckley early the next morning, which was Thursday, April 7--the day of the RIF--from his hotel room in Fenton.  Rowe recalls that Buckley "was extremely agitated, telling [him] that [he] did not cooperate with legal and that [he] was putting the Ferguson case at risk," but that "[w]hen [he] tried to find out what it was that [he] was doing that wasn't cooperative, [Buckley] wouldn't respond." Nevertheless, Rowe testified, he took Buckley's statement, "'You know what I'm talking about.  You're not cooperating with Nancy'" as "code for 'We want you to talk to those employees about what Nancy asked you to talk to them about.'"  Rowe did not seek to clarify that hidden meaning during the call, though he did,

14

according to his testimony, tell Buckley "that both she and
[Brown] knew that only [the human resources] and legal
[departments] had the authority to change the parameters of the
RIF" (adding--as he says he did during his call with Brown--that
he did not oppose doing so "if that's what [the human resources
department] want[ed] to do").[6]

> Rowe also testified that, during his call with Buckley,
>
> > there was no news delivered other than pressure to do
> > something else that she didn't want to be real clear
> > about what it was.  Other than that there was no
> > instruction delivered whatsoever.  But, her commentary
> > and her demeanor toward me was extremely disparaging,
> > as if she was disciplining me, okay?  It's not her role
> > as a human resources person to do that . . . .
> >
> > I'm a level 18, she's a level 17.  She had no
> > business acting the way she did in taking that kind of
> > demeanor toward me.

Rowe testified that, in light of this impertinent behavior,
"there was no doubt that, in my mind--I don't have proof--that
[Buckley] was acting under [the] direction" of Sue Tuthill, the
vice president in the subrogation division who, as referenced at

---

[6]Not surprisingly, the Situation Analysis presents a
different account of this call, reporting that "Rowe appeared
unconcerned with [the] concerns" of the human resources and legal
departments, though he "agreed he should have contacted Brown and
probably should have updated Buckley but he forgot."

the outset, later directed the preparation of the "Situation Analysis" that ultimately called for Rowe to be fired.[7]

### d. **Rowe misses the meeting**

Later that morning, at 9 a.m., Rowe was responsible for conducting a meeting with the "front-line managers" at the Fenton facility "to review talking points [and] next steps" for the RIF, as set forth in the communication plan. See Part I.A.2, supra. At 8:52 a.m., Rowe emailed Uskoski (who was staying at the same hotel), asking what time she was heading to the facility. Uskoski responded, "Were [*sic*] here--we have the manager meeting at 9." Rowe did not respond until nearly 25 minutes later (unbeknownst to his colleagues at Liberty Mutual, he had lost his cellphone while en route to Fenton) when he wrote, "Yikes!  I never got the invite and thought we were doing it after the large meetings.  Be there quickly." Rowe did not arrive at the facility until 9:52 a.m.

---

[7]Buckley testified that, after learning "that Steck and Miller's deposition[s] had been noticed and that they were scheduled to be RIFed," she "contact[ed] Sue Tuthill with that news" the same day, April 6.  But Rowe has pointed to, and this court can discern, no evidence that, during this exchange, Tuthill told Buckley to instruct Rowe to exempt Steck and Miller from the RIF (to the contrary, as just discussed, Buckley had emailed Rowe that very same day, telling him to lay Steck and Miller off "as planned").  Indeed, there is no evidence that Tuthill even knew of Brown's alleged wish to tell the employees they were being spared because they needed to testify in Ferguson.

In the meantime, at 9:02 a.m., Uskoski informed Buckley that
Rowe had not yet arrived for the meeting.  Buckley relayed that
information to Tuthill who, Buckley recalls, "was not pleased,"
and directed that Elston (a manager at the facility) conduct the
meeting instead.  He did so.  When Rowe arrived at the facility,
he said he did not realize the meeting was scheduled to start at
9 a.m. because he had not received a "meeting maker" notice via
his email--though, as already noted, the meeting was listed on
the copy of the communication plan he had received just three
days earlier, on April 4.  In any event, Rowe proceeded to
conduct the meeting at 10:30 a.m. to notify the employees who
were being laid off, including Steck and Miller.  The record does
not reflect what else, if anything, those two employees were told
about their upcoming depositions, or any other matter.

### e.   The fallout

In a conversation with Tuthill later that day, Buckley
discussed her "concerns" with Rowe's performance leading up to
the RIF, which Tuthill asked Buckley to "document."  Buckley then
drafted a list of "[c]oncerns regarding Mike Rowe and
questionable decisions and/or poor judgment in several critical
areas of the subrogation reorganization," which includes, among
several other items, his arriving 50 minutes late for the meeting
with the managers.  The memorandum also states that Rowe

17

"[f]ailed to advise [the human resources department] of 2 impacted employees involved in a class action case where the attorney asked him as recently as [April 4] not to notify the employees as they have been called as witnesses." But the memorandum (at least in the excerpt contained in Rowe's summary judgment objection) does not fault Rowe for--or even mention--any "refusal" on his part to exempt the employees from the RIF, whether because he viewed it as an attempt to influence their testimony or otherwise.

The next day, April 8, 2011, Buckley presented the memorandum to Tuthill, and the two met (together with Kathleen Conlin, an assistant vice president of human resources) to review Rowe's performance leading up to RIF and identify "what issues there were." Per Tuthill's testimony, they decided that Buckley would prepare the "Situation Analysis" in order to "have a conversation about what the options were, what everybody else felt about the behavior that had occurred, and then come back and talk to" Taliancich, Rowe's boss, when he returned from vacation on the next business day, Monday, April 11, 2011.

The Situation Analysis sets forth a number of alleged failings by Rowe in the months leading up to the RIF, including his showing up more than 50 minutes late for the meeting with the Fenton managers. The Situation Analysis also states that, during

Rowe's April 4 conversation with Brown, she "directed Rowe not to communicate to two employees as they have been named as key witnesses in a class action law suit.  Rowe advised he would update Brown shortly but Brown had not heard back nor had he responded to her call" as of April 6.  On that day, the document recounts, Brown contacted Rice (her fellow in-house lawyer) "to advise [she was] aware of the [RIF] announcement in [the Liberty Mutual] subrogation [division] on [April 7, 2011] but was concerned as she had an outstanding issue with Rowe which could impact the announcement."

As Rowe emphasizes, the Situation Analysis faults him for "his failure to follow advice of counsel related to the class action law suit as well as his actions associated with the [RIF] process," as well as for, during that process, having "appeared unconcerned at the direction given to him by" the human resources and legal departments, including "several . . . occasions [when] he failed to follow specific direction."  But the Situation Analysis does not mention Rowe's alleged "refusal" to tell Steck and Miller that their jobs were being spared due to the need for their testimony in <u>Ferguson</u>.  To the contrary, as just quoted, the document states that Brown "directed Rowe <u>not</u> to communicate" to the two employees, and that Rowe "advised he would update [her] shortly" (emphasis added).

19

On Monday, April 11, Taliancich reviewed the Situation Analysis during a conference call with Tuthill, Buckley, and Conlin.  Taliancich testified that, during the call, the reference in the Situation Analysis to the "advice of counsel" that Rowe failed to follow was explained as Brown's request "to contact human resources to let them know . . . that there's a couple people that [Brown] would like to discuss . . . [who] were part of the RIF and [Rowe] was supposed to connect them with" the human resources department.  While Taliancich recalled that he suggested that Liberty Mutual impose "progressive discipline, maybe a first and final warning" against Rowe, ultimately those on the call reached a consensus that Rowe should be terminated.

On the final version of the Situation Analysis form, under the heading "Termination Reason," the box is checked next to "Performance," and the words "egregious perf[ormance] failure" are written.  The document also bears the handwritten word "Approved" above the signature of Roxanne Martinez, Liberty Mutual's vice president of human resources, and the date of April 12, 2011.[8]  Below that are the initials of Liberty Mutual's

---

[8]Rowe makes much of the fact that, in an email sent to Tuthill and Buckley the night before their call with Taliancich, Conlin wrote that, on Friday, April 8, she had spoken to Martinez and "she [was] supportive of the decision to terminate" Rowe. According to Rowe, this email shows that it was Martinez who made that decision, rather than Taliancich, as Liberty Mutual has claimed.  But this inconsistency (if it is one) has no effect on

president and chief executive officer, J. Paul Condrin, and, again, the date of April 12, 2011.  On April 15, 2011, Taliancich told Rowe he was being fired.

As a result, Rowe was unable to keep his meeting with Brown (which, as noted supra, had been scheduled for April 18, 2011), to discuss Liberty Mutual's "posture toward made whole states nationally."  Though Rowe has identified his email requesting that meeting as his act of "whistleblowing," and claims that Liberty Mutual fired him for it, he has not pointed to any evidence that anyone involved in the decision to fire him knew about either the email or his scheduled meeting with Brown. Brown, for her part, testified that she was not consulted about Rowe's termination and did not even learn of it until after the fact.  Rowe has testified that he could not specifically remember telling anyone else about the scheduled meeting.

---

the outcome of Liberty Mutual's summary judgment motion, since there is no evidence that either Taliancich or Martinez knew that Rowe had even been asked, let alone "refused," to exempt Steck and Miller from the RIF in attempt to induce favorable testimony in the Ferguson matter.  Indeed, neither Conlin's email (which summarizes her conversation with Martinez), nor the portions of Martinez's deposition testimony that have been excerpted in Rowe's summary judgment motion, suggests otherwise.

21

**B.    Procedural history**

Acting through counsel, Rowe filed this action in Rockingham County Superior Court in June 2011, a little more than two months after he was terminated.  Liberty Mutual duly removed the case to this court, see 28 U.S.C. § 1441, invoking its diversity jurisdiction, see id. § 1332(a)(1).

**1.    Discovery disputes**

The scheduling order in this action, as twice extended upon the parties' joint motion, imposed a simultaneous discovery cutoff and summary judgment deadline of April 1, 2013.  Through counsel, Rowe took extensive discovery from Liberty Mutual, by interrogatories, document requests, and the depositions of nine different Liberty Mutual employees, including Brown, Buckley, Uskoski, Tuthill, Taliancich--and even Condrin, the CEO.

At the depositions of Brown and Buckley, counsel for Liberty Mutual instructed them not to answer certain questions about their April 6 meeting, invoking the attorney-client privilege. Liberty Mutual had also objected, again on the basis of attorney-client privilege, to Rowe's requests for documents concerning that meeting.  And Liberty Mutual had objected to several of Rowe's other document requests, and interrogatories, on the basis of the attorney-client privilege, including documents that, in Liberty Mutual's words, "involve[d] [Rowe's] communications about

22

the Ferguson case."  Liberty Mutual had identified those documents on a privilege log produced in November 2012.

As the deadlines to complete discovery and file summary judgment motions approached, counsel for Rowe moved to withdraw, stating that Rowe had "terminated the services" of his law firm. This court granted the motion, Order of April 9, 2013, and Rowe subsequently notified the court of his intention to proceed pro se, rather than to seek replacement counsel.  Rowe then filed a number of motions seeking various forms of discovery relief. Meanwhile, Liberty Mutual filed its summary judgment motion.

In accordance with its informal procedure for resolving discovery disputes, see Order of Oct. 24, 2011, at 1-2, this court held a telephone conference in May 2012 to address Rowe's motions.  Following the conference, the court issued an order which, inter alia, granted Rowe leave to take the deposition of an additional Liberty Mutual employee, Martinez, but otherwise denied his discovery motions as untimely, "except insofar as they seek particular information as to which Liberty Mutual has claimed attorney-client or work product privilege." Order of May 20, 2013, at 1-2.  This information included the substance of the April 6 meeting, as well as "certain communications, in which Rowe participated, related to his alleged concerns over Liberty Mutual's made-whole practices, including the Ferguson litigation

23

in Montana, as identified in [the] privilege logs." Id. at 2-3
(quotation marks omitted).  The court ordered Liberty Mutual to
file a motion for a protective order, see Fed. R. Civ. P. 26(c),
showing both that these communications were privileged and that
any privilege had not been waived, Order of May 20, 2013, at 3-4.
The order also stayed Rowe's deadline to respond to Liberty
Mutual's summary judgment motion until after the ruling on
Liberty Mutual's motion for protective order.  Id. at 4.

    After receiving that motion, the court denied it, ruling
that Liberty Mutual had in fact waived any attorney-client
privilege that had protected those communications.  Order of July
16, 2013, at 10-11.  So the court ordered Liberty Mutual to
produce the documents about the April 6 meeting that it had
identified on its privilege logs, as well as to produce Brown and
Buckley for re-opened depositions (to be conducted at the
courthouse, at Liberty Mutual's sole expense) on the subject of
the April 6 meeting.  Id. at 19.  Furthermore, the court ordered
Liberty Mutual to produce, for in camera review, "the
communications about the Ferguson lawsuit or related matters
identified on its privilege log of November 2012." Id. at 20.
Noting Liberty Mutual's position that these documents were only
"arguably" responsive to Rowe's document requests, the court
explained that, following the in camera submission, it would

24

"review those documents to determine their relevance, if any, to this action" and that, if the court found any of them relevant, it would order Liberty Mutual to produce them to Rowe.  Id.

In response, on July 18, 2013, Liberty Mutual produced the previously withheld documents as to the April 6 meeting,[9] and scheduled, with Rowe's consent, the re-opened depositions of Buckley and Brown to take place on August 7, 2013.  Around 9 a.m. on that day, however, Rowe, by way of a filing with this court, expressly "waiv[ed] his rights to [re-open] the two depositions" (this filing also served to notify Liberty Mutual's counsel of that decision).

Meanwhile, Liberty Mutual and Rowe separately moved for reconsideration of that portion of the court's order directing in camera submission of the communications about Ferguson identified on the privilege log--but, in the interim, Liberty Mutual filed those materials in camera anyway, after this court denied its motion to hold off on doing so until after a ruling on the motions to reconsider.  Order of July 25, 2013.  The court then denied those motions, ruling, in relevant part, that they were moot because the documents submitted for in camera review were

_____

[9]As Liberty Mutual explained in a subsequent filing, it had inadvertently omitted one document from this production, but notified both the court and Rowe of this error, and produced that document to him, on July 31, 2013--a full week before the re-opened depositions were scheduled to occur.

not, in fact, relevant to "Rowe's concerns with Liberty Mutual's made-whole practices in states outside of Montana, or for that matter, on a national level.  Nor, so far as this court can tell, are they relevant to any other issue in the case." Order of Aug. 8, 2013, at 11-12.  The court granted Liberty Mutual a protective order against producing those documents to Rowe.  Id. at 12.

### 2.  Summary judgment briefing

Rowe ultimately filed his objection to Liberty Mutual's summary judgment motion on August 31, 2013--nearly five months after the motion had been filed.  As already noted, the objection is 63 pages long--more than 2 ½ times the page limit imposed by this court's rules.  See L.R. 7.1(a)(3).  Liberty Mutual filed a reply, and Rowe (with the requisite leave of court) filed a sur-reply.  Per its usual practice on dispositive motions, the court then announced its intention to hear oral argument on Liberty Mutual's motion for summary judgment, ordering the parties to notify the court if they wanted it to decide the motion solely on the papers instead.  Order of Nov. 6, 2013.  Both Liberty Mutual and Rowe opted to have the motion decided without oral argument.

## II.  Applicable legal standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the

26

movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(a). A dispute is "genuine" if it could reasonably be
resolved in either party's favor at trial by a rational finder of
fact, and "material" if it could sway the outcome under
applicable law. See Estrada v. Rhode Island, 594 F.3d 56, 62
(1st Cir. 2010).

In analyzing a summary judgment motion, the court "views all
facts and draws all reasonable inferences in the light most
favorable to the non-moving" party. Id. Nevertheless, as
already noted, "[u]nsupported allegations and speculation do not
demonstrate . . . a genuine issue of material fact sufficient to
defeat summary judgment." Rivera-Colón, 635 F.3d at 12. Rather,
"[t]o defeat a motion for summary judgment, the nonmoving party
must set forth specific facts showing that there is a genuine
issue for trial." Welch v. Ciampa, 542 F.3d 927, 935 (1st Cir.
2008) (quotation marks omitted).

III. **Analysis**

Under that standard, Liberty Mutual is entitled to summary
judgment. To prevail on his common-law claim for wrongful
termination, Rowe must prove, inter alia, that he was fired
"because [he] performed acts which public policy would encourage
or because he refused to perform acts which public policy would
condemn." Short v. Sch. Admin. Unit No. 16, 136 N.H. 76, 84

(1992) (emphases added).  To prevail on his claim under the
Whistleblowers' Protection Act, Rowe must likewise prove that he
was fired either "because . . . [he], in good faith, report[ed]
. . . what [he] ha[d] reasonable cause to believe [was] a
violation of . . . the laws," or "because . . . [he] object[ed]
to or refuse[d] to participate in any activity that [he], in good
faith, believe[d] [was] a violation of the law."  N.H. Rev. Stat.
Ann. §§ 275-E:2, I(a)-I(b) (emphases added).

        Liberty Mutual argues, among other things, that no rational
trier of fact could conclude that Rowe was terminated because he
performed an act public policy would encourage; refused to
perform an act public policy would condemn; or reported, objected
to, or refused to participate in any act that he believed to
violate the law.  Specifically, Liberty Mutual argues that Rowe
cannot point to any evidence that anyone involved in the decision
to fire him knew that he had (as he alleges) "report[ed] Liberty
Mutual's noncompliance with 'made whole' statutes" or refused to
tell Steck and Miller "that their jobs were being spared because
of the Ferguson case."  As the Court of Appeals has explained:

> to successfully establish a claim of unlawful
> retaliation there must be, at a minimum, competent
> evidence that the alleged retaliators knew of the
> plaintiff's protected activity . . . .  The reasons
> underlying such a requirement are obvious:  if a
> supervisor or other employee is unaware of the fact a
> plaintiff engaged in protected conduct, any actions

28

attributable to [that supervisor or employee] could not
have plausibly been induced by retaliatory motives.

Alvarado v. Donahoe, 687 F.3d 453, 459 (1st Cir. 2012) (quotation
marks and ellipse by the court omitted).[10]

As just discussed at length, see Part I.A.2, supra, the
summary judgment record contains no evidence that anyone involved
in the decision to fire Rowe knew that he had reported what he
now claims was Liberty Mutual's "violation" of made-whole laws,
nor that he had "refused" to tell Steck and Miller "that their
jobs were being spared because of the Ferguson case."  While Rowe
has testified that he declined Brown's suggestion to speak with
Steck and Miller about sparing from the RIF in hopes of obtaining
favorable testimony from them in the Ferguson case, see Part
I.A.2.b, supra, Rowe has not identified any evidence that either
he or Brown relayed this aspect of their conversation to anyone

---

[10]Although the Alvarado decision applied federal law,
specifically, the anti-retaliation provision of the
Rehabilitation Act, 29 U.S.C. § 791 et seq., the New Hampshire
Supreme Court has looked to cases applying the anti-retaliation
provisions of federal employment law in applying the
Whistleblowers' Protection Act.  See In re Seacoast Fire Equip.
Co., 146 N.H. 605, 608 (2001); cf. Bourque v. Town of Bow, 736 F.
Supp. 398, 403 (D.N.H. 1990) (considering, as an argument for
summary judgment against state-law wrongful discharge claim, that
decisionmakers had no knowledge of protected activity, but
denying summary judgment due to a genuine dispute on that point).
And Rowe does not question that, to prove that he was fired
"because of" his allegedly protected activity, someone involved
with the decision to fire him must have at least known of that
activity.  Indeed, that requirement is "commonsensical[]."
Alvarado, 687 F.3d at 459.

involved in the subsequent decision to fire him.  And while Rowe told Brown via email that the "old practices [Liberty Mutual] followed in Montana are pretty much what we follow today in other made whole states," he has likewise failed to identify any evidence that either he or Brown relayed the substance of that email to anyone involved in the subsequent decision to fire him. In short, Rowe has failed to point to any "competent evidence that the alleged retaliators knew of [his] protected activity." Alvarado, 687 F.3d at 459.  In resisting this conclusion, Rowe makes two principal arguments, but they are unpersuasive, for the reasons discussed fully below.

Before embarking on that discussion, the court pauses to note that there is ample evidence that Rowe's failure to pursue removing Steck and Miller from the RIF played a role in his firing.  But Rowe does not argue that the mere act of sparing those employees from the RIF--i.e., without, in what Rowe sees as an attempt to influence their testimony in the Ferguson case, also telling them that they would have been laid off but for the need for that testimony--would have offended public policy.  Nor does Rowe argue that he thought that act alone would have been illegal.  Rowe's own statements, in fact, reveal that his only problem with simply removing Steck and Miller from the RIF (again, without telling them that they had originally been

selected for the RIF but had been removed so they could testify
for the company in <u>Ferguson</u>) was that he lacked the authority to
do so.  As Rowe testified at his deposition, he told Brown that
"'if [she] and whoever in human resources want[ed] to exclude
[Steck and Miller] from the RIF,'" then he was "'not going to
complain or object to it.  But . . . I don't have the authority
to make that decision.'"

Rowe therefore appears to have abandoned the assertion in
his complaint that "[p]ublic policy discouraged [him] from
removing Mr. Steck and Mr. Miller from the RIF because RIFs must
be done according to objective parameters" (and, prior to Brown's
conversation with Rowe, the parameters for the Fenton RIF had
already been set).  Indeed, Rowe does not argue that theory in
his summary judgment objection, so he has waived it.  <u>See</u>, <u>e.g.</u>,
<u>Landrau-Romero v. Banco Popular de P.R.</u>, 212 F.3d 607, 612 (1st
Cir. 2000).  Thus, while this court is skeptical of the notion
that an enforceable <u>public policy</u> encourages employers to conduct
lay-offs "according to objective parameters,"[11] the court need

_____

[11]Using objective criteria (such as quantitative performance
review scores, or seniority) in selecting employees for
reductions-in-force is no doubt a sound business practice in
that, among other things, it lends a sense of fairness to a
difficult process and helps to minimize the risk of employment
claims.  There is a difference, however, between the dictates of
sound business practice and the dictates of public policy (though
the two no doubt overlap at times).

31

not reach that issue here.  Instead, the court will decide the
summary judgment motion based on the theories Rowe has chosen to
pursue in his objection, <u>viz.</u>, that he was fired for "reporting
Liberty Mutual's noncompliance with 'made whole' statutes" and
refusing to tell Steck and Miller "that their jobs were being
spared because of the <u>Ferguson</u> case."

### A.    The Situation Analysis

In opposing summary judgment, Rowe points to the statement
in the Situation Analysis faulting him for his "failure to follow
advice of counsel"--which, he says, "the record proves is a
euphemism for his refusal to participate in the scheme to spare
the two employee witnesses from the planned [RIF] as an
inducement for their testimony."  But Rowe does not identify
anything in the record that supports, let alone "proves," this
theory, and this court's own examination of the record does not
reveal any support for the theory either.

The Situation Analysis itself recounts that Brown, the
in-house attorney, "directed Rowe not to communicate to two
employees as they have been named as key witnesses in a class
action law suit" and that, rather than "refusing" to do so, "Rowe
advised he would update Brown shortly but that Brown had not
heard back" as of April 6.  Crucially, the Situation Analysis
does <u>not</u> say that Brown directed Rowe to tell the employees that,

32

as he alleges, "their jobs were being spared because of the
Ferguson case," let alone that Rowe refused to do so.[12]  To the
contrary, as just quoted, the Situation Analysis says that Brown
told Rowe not to communicate to Steck and Miller at all; that is
the only "advice of counsel" mentioned in the document.

Of course, Rowe's sworn version of events is that Brown in
fact "asked me if I thought that, if I spoke with the employees
about sparing them from the RIF, we might get better testimony
from them," and that he replied that he was not "comfortable
connecting their sworn deposition testimony with sparing their
jobs because doing so would give the distinct impression that we
were trying to influence testimony."  The court is bound to
accept this version as true in ruling on Liberty Mutual's motion.
See Part II, supra.  But that indulgence is not enough for Rowe
to avoid summary judgment.

As the Court of Appeals has explained, in a similar context,
"what counts" in showing that the defendant discharged the
plaintiff for particular conduct is not whether the plaintiff in
fact engaged in that conduct, but "whether the decisionmaker
. . . believed the plaintiff" to have done so "and, if so,
whether [the decisionmaker] acted on that belief to send the

---

[12]This is unsurprising, given the lack of evidence that
either Brown or Rowe said anything of the sort to Buckley, who
prepared the Situation Analysis.  See infra Part III.B.

plaintiff packing." Bennett v. Saint-Gobain Corp., 507 F.3d 23,
31 (1st Cir. 2007).  Here, again, there is no evidence that, at
any time before the decision to fire Rowe was made, either he or
Brown provided any of the "decisionmakers" with the version of
events he has provided in this lawsuit, i.e., that he declined
Brown's entreaty to tell Steck and Miller that their jobs had
been spared because of their upcoming testimony in the Ferguson
case.  So whether or not Rowe actually did that is "beside the
point" in proving that he was fired because of it.  Id.

There is also no evidence that anyone who reviewed the
Situation Analysis in making the decision to fire Rowe understood
its reference to his "failure to follow advice of counsel" as a
"euphemism" for his taking a stand against trying to influence
the testimony of Steck and Miller by telling them their jobs had
been saved.  To the contrary, Rowe's boss, Taliancich, said he
was told that the "advice of counsel" Rowe disregarded was
Brown's request that Rowe "contact human resources to let them
know . . . that there's a couple people that [Brown] would like
to discuss . . . that were part of the RIF."  (It is also worth
noting that, while Rowe himself emailed Taliancich about the call
with Brown, that message did not say that Brown had asked Rowe to
tell Steck and Miller they were not being laid off because they
were needed to testify; the email says only that Brown was

34

"trying to intercede in the RIF.")  So there is simply no record
support for Rowe's theory that, by referring to his "failure to
follow advice of counsel"--specifically, Brown's direction not to
communicate to Steck and Miller--the Situation Analysis was sub
silentio alerting those who read it that, in fact, Rowe had
refused to follow Brown's alleged advice to do the opposite,
i.e., tell the employees that they were not being laid off so
they could testify in the <u>Ferguson</u> case.

> **B.   The April 6 meeting**

Rowe also argues that Liberty Mutual's "deliberate
obstruction of discovery" into the April 6 meeting among Brown,
Buckley (the human resources employee), and Rice (the in-house
employment lawyer) serves as "a clear indication" that, during
the meeting, Brown "shared both [Rowe's] resistance to the
employee witness scheme" and his "reports of violations of the
made whole doctrine."  It is true that Liberty Mutual resisted
most of Rowe's attempts at discovery into what transpired at that
meeting, objecting on the basis of the attorney-client privilege.
<u>See</u> Part I.B.2, <u>supra</u>.  But, as Liberty Mutual points out, while
"a party's refusal to testify or produce evidence in civil suits
creates a presumption of intent to withhold damaging information
that is material to the litigation . . . , courts have declined
to impose [such] adverse inferences on invocation of the

attorney-client privilege." Knorr-Bremse Systeme Fuer
Nutzfahrzeuge GmbH v. Dana Corp., 383 F.3d 1337, 1345 (Fed. Cir.
2004) (applying federal law); accord N.H. R. Evid. 512 (providing
that "[n]o inference may be drawn" from "[t]he claim of a
privilege").  So the law would not permit a rational trier of
fact to do what Rowe urges, i.e., use Liberty Mutual's claim of
attorney-client privilege as to the meeting to infer that the
meeting was when Brown told Buckley of Rowe's protected activity.

Moreover, acting on Rowe's motion, this court ruled that
Liberty Mutual had waived any privilege protecting the April 6
meeting, and ordered Liberty Mutual to turn over related
documents, as well as to produce (at its sole expense) both Brown
and Buckley for re-opened depositions on the subject of the
meeting.  See Part I.B.2, supra.  Rowe received the documents
but, on the day the re-opened depositions were set to occur,
announced that he was waiving his right to conduct them.  See id.
In the final analysis, then, the reason that Brown and Buckley
did not answer all of Rowe's questions about the April 6 meeting
was that he chose not to ask them, not that Liberty Mutual
invoked the privilege.  Obviously, when a party elects to forego
available means of discovery on a subject, he cannot point to the
absence of that discovery as a reason that summary judgment

should not enter against him.  See Vargas-Ruiz v. Golden Arch
Dev., Inc., 368 F.3d 1, 5 (1st Cir. 2004).

In addition, Buckley did answer some of Rowe's deposition
questions about the April 6 meeting, and neither that testimony
nor the other discovery that Rowe received on the subject lends
any support to his theory that the meeting must have been when
Brown enlightened Buckley as to Rowe's allegedly protected
activity.  First off, there is no evidence that, during the
meeting or otherwise, Brown communicated Rowe's request to
discuss his concerns over Liberty Mutual's made-whole practices
outside of Montana.[13]  While there is evidence that Brown and
Buckley discussed the fact that Steck and Miller were slated for
both deposition in Ferguson and termination in the RIF (indeed,
that discussion was the meeting's stated purpose), there is no
evidence that, during that discussion, Brown shared any desire to
tell those employees that they would have been laid off but for
their upcoming depositions, let alone that she had asked Rowe to
make that happen but he had refused.

---

[13]Rowe states in his objection that he had "reported
verbally" to Sean McSweeney, a vice president in Liberty Mutual's
litigation department, "that the made whole practices that had
been employed in Montana were being employed by Liberty Mutual []
nationwide."  This statement, however, is unaccompanied by any
actual evidence that Rowe made that report or, more importantly,
that McSweeney shared the fact of Rowe's report with anyone
involved in the decision to terminate him, and this court can
discern no such evidence in the record.

To the contrary, Buckley testified that Brown notified her of an "outstanding issue with Rowe," namely, that "two employees were named as witnesses in a lawsuit and that there was a request not to notify these employees"--in other words, that Brown had asked Rowe "not to communicate to Steck and Miller . . . that they were going to be RIFed." This testimony is consistent with the account of the meeting set forth in the Situation Analysis, most significantly in that neither mentions any request by Brown that Rowe tell the employees they were being spared from the RIF because of their upcoming deposition testimony.

Buckley's testimony is also consistent with both the email she sent and the call she made to Rowe to inform him of what happened at the meeting (Rowe, of course, had been invited to participate in the meeting, but declined). Rather than directing Rowe to tell Steck and Miller that their jobs had been saved because they were needed to testify in Ferguson, the email said to lay off the two employees "as planned" and to put them in touch with the legal department if they have "questions with respect to the [Ferguson] case." Furthermore, even on Rowe's version of the call he received from Buckley the next day, "there was no instruction delivered" aside from what she had already stated in the email.

While, of course, Rowe testified that he took Buckley's criticizing him in the call as "code for 'We want you to talk to those employees about what [Brown] asked you to talk to them about,'" no rational trier of fact could understand Buckley's remark that way.  Rowe himself says that Buckley did not explain what she meant by "not cooperating" and, again, there is no evidence that Buckley knew that Brown had asked Rowe to "talk to the employees"--all of the record evidence is that, so far as Buckley knew, Brown had asked Rowe <u>not</u> to talk to them.[14]

A further problem with Rowe's theory that Buckley was speaking in "code" is that it depends on his sense that, given her impertinent tone, she must have been "acting under [the] direction" of Tuthill (who subsequently directed Buckley to prepare the Situation Analysis calling for Rowe's termination). But, even putting aside Rowe's concession that he "do[es]n't have proof" that Buckley was doing Tuthill's bidding during the call, he also lacks proof that Tuthill even knew about Brown's alleged desire to attempt to influence the testimony of Steck and Miller

---

[14]This includes Brown's April 6 emails to Buckley, which Liberty Mutual had originally withheld on the basis of attorney-client privilege, but eventually produced pursuant to this court's order.  In those emails, as discussed in more detail in Part I.A.2.b, <u>supra</u>, Brown expresses her preference for Steck and Miller "not to be told about the RIF," and says nothing about telling them they would have been laid off if they were not needed to testify.

by telling them their jobs had been spared.  Again, there is no
evidence that Buckley knew that, nor is there any evidence that
Brown ever communicated her alleged wishes (or anything else, for
that matter) to Tuthill.

A party opposing summary judgment enjoys the benefit of all
reasonable inferences--but not "improbable inferences" or
"unsupported speculation." Mariani-Colón v. Dep't of Homeland
Sec'y ex rel. Chertoff, 511 F.3d 216, 221 (1st Cir. 2007).
Rowe's theory that, at the April 6 meeting, Brown communicated
that he had refused to tell Steck and Miller their jobs were
being spared so they could testify in the Ferguson case relies on
pure speculation, buttressed only by unreasonable--if not
irrational--inferences that Buckley secretly wanted Rowe to do
the opposite of what she had already told him to do.

"A court pondering a summary judgment motion need not
embrace inferences that are wildly improbable or that rely on
tenuous insinuation . . . [e]ven in cases where elusive concepts
such as motive or intent are at issue." Rosenfeld v. Egy, 346
F.3d 11, 17 (1st Cir. 2003) (quotation marks and bracketing by
the court omitted).  Indeed, this court has rejected a
plaintiff's attempt to show a genuine issue as to the
decisionmaker's knowledge of the plaintiff's protected activity
where that attempt relied solely on the plaintiff's subjective

interpretation of statements by the decisionmaker that did not, on their face, reveal any such knowledge.  See Antonis v. Elecs. for Imaging, Inc., 2008 DNH 204, 13-14 (ruling that manager's asking plaintiff whether he knew in advance of a surprise state inspection--which plaintiff denied--did not create a triable issue as to why he had been fired, despite his testimony that, based on the manager's accompanying demeanor, "it started to get into my head, he thinks I called these people and knew they were coming").  Rowe's speculation and insinuation, then, fail to demonstrate a triable issue as to whether anyone involved in the decision to fire him knew of his allegedly protected activity.

### C.   Rowe's other arguments

Rowe's lengthy summary judgment objection also contains a few other arguments, but they are misplaced.  First, Rowe argues that a triable issue exists as to whether the reasons that Liberty Mutual gave for firing him are pretextual.  But a court "need not consider . . . evidence of pretext" unless a plaintiff can first "establish a prima facie case of retaliatory discharge," including, as already discussed, "a causal link between his protected [activity] and his discharge from employment."  Lewis v. Gillette Co., 22 F.3d 22, 25 (1st Cir.

41

1994) (applying federal anti-retaliation law).[15]  To do that, as
also already discussed, the plaintiff must present some evidence
that (among other things) those who decided to discharge him knew
of his allegedly protected activity.  Because Rowe has not come
forward with any such evidence, it is immaterial--for purposes of
summary judgment, at least--whether he can show the reasons
Liberty Mutual gave for firing him are pretextual.  See id.; see
also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) ("a
complete failure of proof concerning an essential element of the
nonmoving party's case necessarily renders all other facts
immaterial" and "mandates the entry of summary judgment").

        Second, Rowe attacks the credibility of some of the Liberty
Mutual employees whose depositions he took in this case, pointing
to what he sees as inconsistencies in their accounts of certain
events leading up to his firing.  So far as the court can tell,
however, none of these claimed inconsistencies bears on the issue
of whether anyone involved in Rowe's firing knew of his protected

---

[15]Again, New Hampshire law is in accord.  See Seacoast Fire
Equip., 146 N.H. at 608 (explaining that "[o]nce the [plaintiff]
has presented a prima facie case," including that "there was a
causal connection between the protected act and the proscribed
employment action," then "the burden shifts to the employer to
articulate some legitimate, nondiscriminatory reason" and the
plaintiff "must then be given the chance to demonstrate that the
employer's proffered reason was actually a pretext") (emphasis
added; quotation marks and bracketing omitted).

activity.[16]  Whether the employees' testimony as to other issues
calls their credibility into question, then, is also immaterial
to the summary judgment analysis.  A plaintiff cannot "defeat a
defendant's properly supported motion for summary judgment . . .
without offering any concrete evidence from which a reasonable
juror could return a verdict in his favor and merely asserting
that a jury might, and legally could, disbelieve the defendant's
denial" of culpable knowledge.  Anderson v. Liberty Lobby, 477
U.S. 242, 256 (1986) (bracketing omitted).

Third, and finally, Rowe asserts that he was fired not only
because he refused to tell Steck and Miller their jobs had been
saved by their upcoming depositions in the Ferguson case, and
because he reported Liberty Mutual's violations of made-whole law
outside of Montana, but also because his actions "prevented
[Liberty Mutual] from violating . . . Title VII of the Civil
Rights Act of 1964," 42 U.S.C. §§ 2000e-2.  This is so, Rowe
argues, because Steck and Miller are "white males and under the
scheme, they would have been provided with ongoing opportunities

_____

[16]Indeed, Rowe focuses his attack on what he sees as
contradictions between the deposition testimony of Uskoski, one
of the human resources employees who worked on the RIF, and the
affidavit she submitted in support of Liberty Mutual's summary
judgment motion.  The court does not necessarily agree that there
are any such contradictions but, regardless, there is absolutely
no evidence that Uskoski knew anything of Rowe's allegedly
protected activity, or had anything to do with the decision to
fire him.  Rowe does not claim otherwise.

43

that employees of a protected class, who met the same selection criteria, would not have had equal opportunity to pursue."  Of course, the reason Steck and Miller would have been spared from the RIF was not that they are "white males," but for the race-neutral reason that their depositions had been noticed in Ferguson.  Assuming that Rowe nevertheless believed--contrary to basic tenets, but in good faith--that removing them from the RIF would have violated Title VII simply because they happen to be white males, this theory does not help him at this point.  Rowe's complaint does not say that he was fired for resisting what he thought was a violation of Title VII, nor is there any indication that he advanced this claim at any point since,[17] and a plaintiff "is not entitled to raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment."  Calvi v. Knox County, 470 F.3d 422, 431 (1st Cir. 2006).

---

[17]On May 31, 2013, Rowe attempted to amend his complaint to add a different claim that he had been fired for resisting another alleged violation of Title VII, in February 2011, when he attempted to remove an African-American employee from the RIF (though not because Rowe believed that race had anything to do with why the employee was selected for the RIF).  The court denied that motion as untimely, coming nearly 16 months after the scheduling order's deadline for amended pleadings, and two months after Liberty Mutual's summary judgment motion.  Order of July 16, 2013, at 23-24.

## IV.  **Conclusion**

For the foregoing reasons, Liberty Mutual's motion for summary judgment[18] is GRANTED.  The clerk shall enter judgment accordingly and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated: December 6, 2013

cc:  Michael A. Rowe, pro se
     Emily G. Rice, Esq.
     Edward J. Sackman, Esq.

---

[18]Document no. 95.